And the first is number 17-2449. In Re Tribune Media Company, Mr. Young, if I'm mispronouncing that, is the appellant, Mr. Creech, and Mr. Hoffman. And before you start, I also want to acknowledge the privilege of being able to sit with Judge Gene Seiler, Senior Judge on the Sixth Circuit, who is a dear friend of our court, and he's coming back. I don't know why he decides to come back, but we're so blessed to have him. You're welcome. Thank you, Your Honor. May I please reserve five minutes for rebuttal? You certainly may. Thank you. I do represent Keith Young, who is in the court here today for the first time that he's actually able to appear in a courtroom now, almost exactly ten years to the day that he suffered this really egregious act of discrimination that costed his career in the media industry. Mr. Young is 61 now. He was 51 at the time of this incident. He'd been working in radio, television since 1982. He got this big break to get this job at pH 17. It was destroyed by the act of somebody who was very openly racist and noxious, and who just immediately, as soon as Mr. Young walked in, confronted him. I think that's very clear. There was a video that was submitted. You don't see Mr. Young hitting anyone or doing anything like that. You just see, obviously- Obviously, we have a preliminary issue here. Have you challenged the jurisdiction? Yes. Yes, Your Honor. And why is there not implied consent, which wellness clearly allows? Your Honor, because wellness clearly says you have to have notice and an opportunity to refuse that consent. And actually, the rules of bankruptcy procedure and 11 U.S.C. 102 talk about- The rules of procedure have been very clear about it now. But for example, if this was an adversarial proceeding instead of just a contested claim, the complaint would explicitly plead, I consent to the jurisdiction of the bankruptcy court, and I consent to- But the Supreme Court has said that you can have implied consent. Yes, Your Honor. And so it looks like you filed a proof of claim, you responded to a claim of objection, you filed a suppression, a supplemental response, excuse me, to the claim of objection, you attended a hearing, you raised numerous issues on jurisdiction, you acknowledged that the bankruptcy court would fully evaluate his claim. Well, that's a whole lot that you've got to get over. I don't agree with that, Your Honor. Well, let's work backwards. Where did counsel not acknowledge that the bankruptcy court would fully evaluate the claim? That wasn't until after we had seen the wellness decision, and after, Your Honor, that I had- That makes it worse, right? Well, okay, all right, the wellness decision very clearly says, and the language is, notification of the right to refuse is a prerequisite to any inference of consent. And if you look at Rule 102, it says, after notice and hearing, means after such notice as is appropriate in the particular circumstances. You're in effect telling us that we need to say that consent must be expressed. No, Your Honor. I'm saying that if he did not have the opportunity to refuse, he didn't get the notice. It's like any kind of case that goes to arbitration, there's really nothing different about a bankruptcy court hearing the case on a non-court proceeding, which this clearly is, and a case that gets referred to arbitration. There's an argument that under 157, this alternatively is a court proceeding, but at the moment, even if it's non-court, the question is, did you consent? Yeah, and Your Honor, the answer to that is no, and it's clearly a non-court proceeding. In Harris versus Forklift, the Supreme Court acknowledges that Title VII claims are not limited to economic damages, it's a personal injury, the man's dignity was destroyed, his career was destroyed, he doesn't just get lost wages. The cases that call these types of employment disputes of a court proceeding would be the type like a failure to pay overtime, or a failure to pay- How long period of time expired from the time he filed his first claim until the court ruled on this issue, a couple of years? Seven years, Your Honor. And during that time, he never did object to the jurisdiction of the court, did he? Your Honor, if I could talk about that period, they're talking about an eight-year period here, from the discrimination to the appeal to the district court. We submitted an affidavit in the district court, it's in the record, it's at 224A, explaining what Mr. Young had gone through. We're talking about, here what I'm referring to specifically is the prejudice that he'd suffered from not getting the notice that Welles explicitly says he has So yes, someone can imply the consent. If I say, if I'm told, hey, if you argue in this court here today, you're consenting to the jurisdiction, unless you say otherwise, and I fail to say anything about it, then I can't complain later that I didn't consent. But if I'm here and I didn't know that I had the opportunity to complain, and that's exactly what Welles says, that's exactly what rule 7008 says in the bankruptcy procedure. You have to explicitly say, I'm consenting to this, or at least know, hey, you've got to make an objection. Like if there's a jury demand or a non-jury. You know there's rules that say, when you waive your right to a jury trial. Could you have raised the 157B-5 issue under bankruptcy rule 3008 on a motion for reconsideration? We did not file a reconsideration motion. We took an appeal to the district judge, and all of these issues were raised before the district judge. Yeah, but you didn't, did you ever argue to the bankruptcy court that they lacked authority to adjudicate this matter? No, no one argued that in the bankruptcy court. The decision that said that you had to have the prerequisite is notice. And that's my point, your honors. My point is, absolutely, you can impliedly consent. If you knew, look at the notices that set up the hearing. None of them say, you've got to tell us if you have this threshold. We have this threshold question. You're consenting to this jurisdiction. And then you ignore that notice, and you just go and you argue. Well, then you're out of luck. You impliedly consented. But you can't impliedly consent to something that you did not know that you had the right to refuse. That is explicitly the logic of notice. That is explicitly the language in Rule 7008, which is a different type of proceeding, but gives good guidance for what's here. And I believe that the answer is that if you look at Rule 11, USC 102, after notice in hearing is what notice is appropriate under the circumstances. And a notice that's appropriate under the circumstances is one that says, are you really consenting to the bankruptcy court hearing this case? That notice, it's been seven years. I'm the sixth attorney to appear on his behalf in this case. Or at least that he's hired, not to appear on his behalf. When did the first attorney come into the case from the time that the- Okay. Yeah, the first attorney he had wasn't admitted in Delaware. He didn't know anything about bankruptcy law. He's a civil rights attorney, employment discrimination attorney. All he knew was to file the proof of claim. He filed that for and withdrew. What, did he make an appearance in the case? He did not. He just filed a proof of claim. His name is on the proof of claim, but that's it. But he wasn't the attorney actually in the case. No, no, he didn't. Mr. Young had appeared pro se and handled things pro se. I think that's another important issue in this case, is when you see ripping a case away from its home jurisdiction, sending it to Delaware. It's very close in terms of miles away from here, but it's very far away. It's very different. They have a very restrictive bar. They're not letting people practice without local counsel. I encountered that problem myself. I couldn't help Mr. Young until I convinced an attorney to sponsor my pro hoc petition. When did the first attorney make an appearance in the case as an attorney for him? I believe the first attorney was Jack Shrum in 2014. There was an attorney who assisted and called himself a legal consultant, which I believe is illegal, who actually wound up having his own legal problems of his own. That was a Peter Barbieri. He never actually appeared. The only actual official appearance that was made on Mr. Young's behalf was Jack Shrum in 2014. How soon was that after the claim was made? The claim was made in 2009. So it took him all those years to find someone that could at least try to bring this claim. And Mr. Shrum also did not get the notice. Again, he did not appear in court knowing that he had the right to refuse consent. He never asked Mr. Young, hey, do you want consent to jurisdiction in this court? He didn't know. I mean, that's what wellness specifically says. It's not just that you absolutely can't imply the consent. Of the six counsel, which is the first one that had bankruptcy experience? Well, Peter Barbieri, I don't think was admitted there. He wound up being charged with bankruptcy fraud and acquitted. Because the issues in wellness were telegraphed three years before in Stern, right? Somewhat, yes. But it was much clearer in wellness. Yes. I mean, that's... Well, yeah, the question is, does this apply to magistrates and Article I judges and bankruptcy judges? Yes. Both they and magistrate judges being Article I. It was implied, but also in the Stern case, it was very clear that the attorney had actually said, oh, I'm more than pleased to go here and actually withdrew and brought the case back into bankruptcy court. If you look at the history of Stern, it's got nothing to do with this case. This is the kind of case where somebody gets his claim is being processed and the Philadelphia Human Relations Commission just ripped away, shut down. He did file a proof of claim. I mean, the fact is... Yes, which had no such notice. And that was filed by the attorney who was not... Well, I mean, yeah, he's trying to make sure he stakes out the claim so that somebody doesn't claim later on that it's lost. I mean, in that sense, it would seem the right thing to do. Oh, actually, Your Honor, the defense had cited the case that said that you had to proceed in bankruptcy court or not at all. That was a 2007 case, which I think people understood the law to be in 2007. That one actually cited that it was Carter versus safety claim. That was the assumption that everyone was operating under back at the time this claim was filed. While we're on this, why don't we hear from Mr. Hockman and then we'll get you back on rebuttal. Thank you, Your Honors. Good morning, Your Honors. May it please the court, Rob Hockman for Tribune. Judge Siler, let me begin with one of your questions. In terms of the timing and how this went, it's important to note that the objection to the proof of claim wasn't filed. And everything was done in a timely fashion. But the Tribune bankruptcy, as you might imagine, was a large and complicated one. The objection wasn't filed until fall of 2013. So four of those years, really nothing was happening. And I understand... When was the proof of claim bar date? I don't know off the top of my head. Obviously, this was filed timely. But it was timely. And I understand counsel's concern on Mr. Young's behalf for the difficulty that Mr. Young had in obtaining counsel. Did the bankruptcy court ever inform Mr. Young of the need to consent? I don't believe there's anything in the record that suggests that. I don't think that's required. I mean, for one thing, I don't think that... I think you have to go way back. I mean, there are two different kinds of jurisdictional issues, or not jurisdictional, two different kinds of bankruptcy authority to adjudicate issues. The Stern kind of Article III issue is not actually the issue in this case. If you actually read Stern carefully, there were two different issues raised in Stern. One is the question of whether a claim is core under the terms of Section 157B. That one was decided separately from the constitutional claim that was decided. And there, the court said it's not, A, such arguments are not jurisdictional. And it's not a question of consent. It's a question of waiver. If you don't assert the right, you've waived it. And that's what we have here. That's all we have. The kind of claim at issue that creates constitutional waiver concerns, where you have more complicated questions about knowing involuntary waiver, those are ones where the action would necessarily be, those are ones that turn on whether the action would, quote, necessarily be resolved in the claims process. If the answer is they wouldn't be resolved in the claims process, then you have a constitutional issue. But the only thing at issue in this case is whether to allow or disallow a claim. And there. Was this part of the court proceeding? Yes. I mean, it's certainly our view that this is a court proceeding. And it has to be. I mean, Longenkamp makes clear that when you file a claim against the estate, you consent. So bankruptcy court jurisdiction. It's not estimating a claim. It's disallowing a claim. That's correct. That's the simple argument. And on that basis alone, you could resolve the jurisdictional issue here.  And, again, I want to emphasize that this is waiver under STROM, not consent in the wellness sense. And here, as Your Honor has pointed out, it's a waiver. Wait, wait, wait. Waiver. To waive, you have to have somebody tell you what you're waiving, right? I don't think that's true. I don't think that's right. Your conduct. Your conduct by simply participating. I would hate to write that opinion and lead with my chin to the Supreme Court. Well, if it were a constitutional right that was being waived, then I think you'd have a different set of circumstances. And what counts as knowing is also, I think, a hard question. I don't think any court, and I don't think the Supreme Court, has ever suggested you need something like a Miranda warning for bankruptcy court jurisdiction. And that's essentially what I understand counsel to be suggesting here. I don't think you get anywhere near that. But I think that when the bankruptcy court tells you, submit what you've got, tell me what you think your case is, I'm going to decide whether or not this case requires a trial. And if it doesn't, I'm going to disallow the claim. And he says, okay, I think that's sufficient. What does wellness mean, then, in your view? Well, wellness, I think, first of all, applies only to the constitutional right at issue where you have the right to an Article III adjudication of your claim. The claim is not something that can be constitutionally given to the bankruptcy court to determine, not a mere question of allowance or disallowance of a claim that was filed in the bankruptcy proceeding. So put that aside. As for knowing involuntary, what it would mean, I think under these circumstances it would mean at least what we have here, where the bankruptcy court tells you, I'm going to decide this case. I'm going to decide this case. Give me what you have. And nobody says stop. I think that's sufficient. Is your best case the Stern case or is it from some other? I think Stern is the best case for us. In Stern, the court talks about concerns about sandbagging, that what you can't do, according to Stern, is actually adjudicate your claim, lose, in the bankruptcy court, and then after the fact, tell the bankruptcy court that you've pulled the rug out from under it. That just treats litigation as kind of a dry run, like a free bite at the apple, and litigation doesn't function well that way. Let's assume for the moment the court has jurisdiction, and let's deal with the merits. Sure. Wasn't the station on notice that Mr. Schultz had problems? The station may have been on notice, that Mr. Schultz was an irritable person, but there's no indication at all that the station was on notice of any kind of racial animus. Without doubting for a second the kind of alleged comments and the deep offensiveness of the alleged comments that Mr. Young was subjected to, there's simply nothing in the record that suggests the station had any reason to believe that that was coming. There are two prior incidents in the record from the mid-90s and 2002. Neither of them have any suggestion of racial overtones, and in fact, if you look at the supplemental declaration filed by Mr. Giannini in the record, it's R199A to about R204A. He goes through that in specific detail in response to the supplemental submission that was provided where these kinds of assertions were made, and he goes through and he explains that the incidents involved did not have any racial indications or any suggestion of racial hostility, and so there was no notice. There was certainly no notice that what Mr. Young alleges happened was coming. On the merits, the undisputed facts here clearly support the judgment. Young admits that he actively participated in escalating the confrontation. He got in Schultz's face. He followed Schultz after he left the room. He admits to yelling and screaming and using profanity, and that kind of escalated. Primarily as a reaction, however. Absolutely, but still, I think even accepting as true Mr. Young's assertion that he reacted in a way that's natural for a person to react when subjected to these kinds of comments, the fact is the station has a right to insist that employees seek redress through proper means rather than escalating confrontation, and when a policy is shown, as it is here, to be effective at dealing with incidents of misconduct, the employer is entitled to say, you have to resist that temptation, however natural it is. You have to resist it. You have to use proper means because we have to have a functioning workplace, and there's no case that suggests otherwise, and it would be a rather dangerous precedent to set. Did one of the other employees tell the plaintiff here that this other fellow was kind of funny or hostile or anything like that? That's the assertion, and again, putting aside all the problems with the quality of the evidence that was submitted here, we're willing to, for purposes of this judgment and defending the judgment, take even those allegations as true. Again, the fact that there might have been problems, that he might have been an irritable sort of person who's easy to get on his wrong side or that he can be nasty, even if that's true, I don't see how that provides any basis for a racial discrimination claim, either wrongful termination or hostile environment claim at issue here, and those are the claims at issue here. We can accept that one act of discrimination can be severe enough to create a hostile work environment, as happened in Castleberry, but this case is nothing like Castleberry. I mean, Castleberry involved the use of the N-word by a supervisor in front of other black employees with the threat of firing. I mean, this is just nothing like that. And again, the fact that the station had a pretty decisive response demonstrates that there was an available remedy. Can we make it or draw any inference as to his nickname as being a Nazi? I think that would be a stretch. First of all, I think the quality of the evidence on that is very much unclear, but Nazi strikes me as a fairly ambiguous term, and believe me, I am loathe to suggest that Nazi is anything other than a severely, an eyebrow-raising nickname to have, but there are circumstances where Nazi is used just to refer to a generally demanding and irritable sort of person. Think the Soup Nazi from the Seinfeld show. It doesn't necessarily have racial overtones, and again, I am not diminishing that term. It's just without context. You can't know for sure. It's highly ambiguous, and I don't think there's any suggestion that that nickname was generally known to the station or that there was any basis in the record to support the suggestion that it was being used in a specifically deeply offensive racial way, in which it certainly could be. Had Shoaffs ever been reprimanded or called down for any reason because of a racial... The answer is no, Your Honor. As I mentioned, there are a couple of incidences in his file, but nothing ever came of them, and the one from 1994, there's some suggestion in the record that there was something about race, but Giannini's declaration just puts that to bed. It wasn't. It didn't have anything to do with racial issues, and the one from 2003 or 2002, I believe, rather, also just has no racial significance whatsoever. If there are no further questions, Your Honors, we respectfully request that you affirm the judgment. Thank you. Mr. Creech? If we get to the merits. Yes, Your Honor. What notice did the station have of Mr. Schultz's racial animosity? Yes, Your Honor, the station was aware. The person who assigned Mr. Young to work and train under Schultz knew who this guy was and what he was about. It was open. It was common knowledge to everyone in the station. The quality, the evidence of the Nazi is that Schultz called himself the Nazi at the arbitration after he was terminated trying to get a reinstatement or to get some benefits. He said it in front of an arbitrator, in front of a union rep, and in front of Mr. Young. He called himself the Nazi. I mean, it was clear people knew that this man had a problem, and when Mr. Young walked in to start training under the Nazi or Schultz or whatever, he puts his briefcase down and immediately gets accosted. He gets called Spike. Spike, yes. Well, yes, he gets called Spike. He gets called a hoop. He gets called homie. He says, take it back to the hood. I mean, the idea that the station didn't know what this man was about is something that we ought to be able to explore in some discovery. Now, about that point, remember, when the case was finally heard by the bankruptcy judge, the attorney for Tribune said, our objection is a narrow one. It's purely based on a failure of pleading based on a statement of particulars and taking all the facts as stated in the Philadelphia Commission on Human Relations in the complaint as true, and then looking at the video. And they said, so they kind of really short-circuited the process. I mean, they almost looked at it like it was a 12B6 motion, but it wasn't really a 12B6 motion. It was a 56 motion, but there wasn't really any discovery. What you have to show here apparently is vicarious liability or what they call legal term respondeat superior. Yes, Your Honor. And we would like an opportunity for discovery to prove that. We think that we've pled it. And the bankruptcy court threw this case out by saying, well, I'm just going to review what's there, but not really saying that there's a problem with the quality of the evidence. To hear that now after they've made that position in the bankruptcy court that it wasn't about the quality of the evidence, it was that if you take the evidence as true, it's not good enough, that the case has to be reversed under Casselberry. I mean, this was a very extreme incident. It cost him his job. The court's looking at a record. This happened in what, 2008? Yes, about May 7, 2008, 10 years ago, almost in a day, Your Honor. And Schultz had previously been disciplined the last time before that in 1994? I think there was a No. 2 discipline, a No. 3, and then 94. But we're not relying strictly on the – and I think that was a mistake that the bankruptcy court – But you've been looking at this from the perspective of the people at the station. Yes, looking at just what the official record is, like it's turning a blind eye to what this person really was about. I mean, not everything's going to make a personnel file, especially if the station is really accountancing and allowing this kind of environment to exist. You would not expect to see the record to contain a dozen references to racial comments. I mean, you'd think they would not have that kind of – I mean, it would be surprising if there was. But the fact that there wasn't doesn't mean that the case doesn't have any merit. It doesn't mean there wouldn't be responding to superior liability. Let's find out what the station didn't know. And, Your Honor, we believe that the case should be – at a minimum, it was not too late. There was no sandbagging on his part. At a minimum, if the case is to be reversed, he should get the opportunity to object to the bankruptcy jurisdiction. It was really harmless if you look at it that way. So what would you show that there was vicarious liability, that management knew that there were very severe problems and did not address them purposely? Yes, the testimony of many people that were interviewed by the PHRC. There's a very lengthy set of interviews. The Philadelphia Commission on Human Relations took great interest in this case, a surprising amount of interest in this case. They interviewed what looks like a dozen people, multiple phone calls, multiple statements. There was a lot. There was a very big record. It's all in the appendix here. It's been cited at length. We have a lot. There's a lot of things that we can talk about. But we're not allowed to remand this to the Pennsylvania Commission on Human Relations. I mean, you can't remand because the claim has been discharged under Section 524 of the Bankruptcy Code. Your Honor, I believe that the case should be remanded as a non – no, to the – and it should be transferred as a personal injury claim. It should at least be heard in the Eastern District of Pennsylvania. It should be heard in this courthouse, not in the courthouse in Wilmington, and not in the bankruptcy court or the district court there. And the grounds for that are very clear under what happens under personal injury type claims. They can be heard in the district court where the claim arose. And it would make no sense to send Mr. Young back to Delaware just because they're incorporated there. That would be really a terrible thing for him. I mean, the argument of PHL is that the case is over, is right? Well, it wouldn't be over. Forget about the PHRC. I'm saying that the claim could be heard by the United States District Court for the Eastern District of Pennsylvania as a non-court proceeding that gets spun out. That would be the avenue for relief. It's kind of hard to say it's a non-court proceeding even if there was an implied consent. Under a personal injury claim. You understand 157. You can't estimate a claim, but you can't disallow it or allow it one way or the other. Okay. That's just what it says. I can't get around that. I thought that a personal injury claim could be heard either in the district where the bankruptcy court sits or in the district where the claim arose. A court could have maybe decided that it wanted to abstain, but it didn't do that here. Yes. The facts giving rise to why it should abstain are clear from the record. The objections made now. Was that briefed? Yes. Yes. We absolutely briefed abstention. We absolutely did brief that we should send the case to the Eastern District of Pennsylvania. The reason for that was very clearly because you consider personal injury. Did the court rule on that? Yes. The district court said no, that no rights were violated. Everything from that is in the opinion. This was appealed to the district court to what, Judge Sleet? Yes. He was very sensitive to these types of issues. He affirmed the decision of the bankruptcy court by looking at this evidence and not in the light most favorable to Mr. Young. I'm only here to appeal the decision, not to impugn the character. No, he's excellent. There's no doubt about that. I'm just arguing that the district judge made an error. The best remedy for that error would be to allow the case to be heard as a personal injury claim by the Eastern District of Pennsylvania where the action happened, where witnesses are. I don't need local counsel, he's here. Nothing's in Delaware. Thank you very much. Thank you, Your Honor. Thank you to both counsel for well-presented arguments in light of the matter under advisement. Thank you. Thank you.